FILED
NOV 03 2016
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. 15 CR 314 |
| | ) | |
| v. | ) | Violations: Title 26, United States Code, Sections 7201, 7203 and 7212 |
| | ) | |
| DANIEL P. SOSO and | ) | |
| EDWARD R. VRDOLYAK | ) | **SUPERSEDING INDICTMENT** |

**COUNT ONE**

JUDGE AMY ST. EVE
MAGISTRATE JUDGE COLE

THE SPECIAL AUGUST 2015 GRAND JURY charges:

1. At times material to this superseding indictment:

    a. Defendant DANIEL P. SOSO was an attorney licensed to practice law in the State of Illinois.

    b. Defendant EDWARD R. VRDOLYAK was an attorney licensed to practice law in the State of Illinois until in or around 2009. VRDOLYAK was the manager of Law Firm A.

    c. Individual B was an attorney licensed to practice law in the State of Illinois. Individual B was a partner in a law firm, Law Firm B, which maintained law offices in the State of Washington.

    d. The Attorney General of the State of Illinois was the chief legal officer of the State of Illinois and had the authority to initiate lawsuits on behalf of the State of Illinois and its people.

## The Tobacco Lawsuit

e. On or about October 9, 1996, the Attorney General entered into a written contract (the "National Counsel Contract") with several law firms ("National Counsel"), including Law Firm B. Pursuant to the National Counsel Contract, members of these law firms were to be appointed by the Attorney General to act as Special Assistant Attorneys General who would represent the State of Illinois in its anticipated lawsuit against certain tobacco companies to recover, among other things, money damages incurred by the State of Illinois as a result of the sale of tobacco products to residents of the State of Illinois. In addition, the National Counsel Contract provided that the law firms representing the State of Illinois, including Law Firm B, would share a "contingent fee" equal to ten percent of the total monetary recovery realized by the State of Illinois in its planned lawsuit.

f. On or about November 12, 1996, National Counsel entered into a written contract with local counsel (the "Local Counsel Contract"), which was approved and ratified by the Attorney General. Pursuant to the Local Counsel Contract, National Counsel and local counsel (collectively, "Illinois Outside Counsel") agreed:

i. to divide the work for the representation of the State of Illinois as follows: National Counsel would perform approximately seventy percent and local counsel would perform approximately thirty percent of the legal services to be provided to the State of Illinois; and

ii. in accordance with Rules 1.5(f) and 1.5(g) of the 1990 Illinois Rules of Professional Conduct, local counsel would receive thirty percent of the contingency fee payable to National Counsel.

g. On or about November 12, 1996, the State of Illinois filed a lawsuit (the "Tobacco Lawsuit") against the tobacco companies in the Circuit Court of Cook County, bearing the title and case number *People of the State of Illinois v. Phillip Morris, Inc. et al.*, No. 96 L 13146, seeking, among other things, money damages.

h. SOSO and VRDOLYAK were not appointed as Special Assistant Attorneys General, were not authorized to perform any work for the State of Illinois on the Tobacco Lawsuit, and did not perform any work for the State of Illinois on the Tobacco Lawsuit.

### SOSO's and VRDOLYAK's Secret Receipt of Fees from the Tobacco Lawsuit

i. In or around November 1998, the State of Illinois entered into a written agreement, known as the "Master Settlement Agreement," that resolved the Tobacco Lawsuit. Pursuant to the Master Settlement Agreement, the State of Illinois was projected to receive a total of over $9.3 billion in payments from the settlement of the case, to be made on a quarterly basis over a period of more than two decades.

j. Pursuant to the terms of the Master Settlement Agreement and a related agreement, called the "Illinois Fee Payment Agreement," the settling tobacco companies agreed to pay reasonable attorney fees for the work performed by Illinois

Outside Counsel in the Tobacco Lawsuit. The Master Settlement Agreement and the Illinois Fee Payment Agreement provided, among other things, for an arbitration proceeding, during which an arbitration panel would determine how much money would be awarded to Illinois Outside Counsel by the tobacco companies.

k. On or about April 9, 1999, Illinois Outside Counsel submitted to an arbitration panel a document entitled "Submission of State of Illinois Special Counsel," which relied on the "contingent fee" provision of the National Counsel Contract in seeking payment of ten percent of the State of Illinois's total recovery from the Tobacco Lawsuit, which percentage was calculated to be approximately $935 million. Based on the fee sharing agreement contained in the Local Counsel Contract, National Counsel's share of this amount would be 70%, or approximately $654 million. The tobacco companies objected to Illinois Outside Counsel's $935 million fee request as excessive.

l. After an arbitration hearing held in San Francisco, California, in September 1999, the arbitration panel awarded Illinois Outside Counsel a total of $121 million in fees for their work on the Tobacco Lawsuit. The tobacco companies began making payments of this amount on a quarterly basis beginning in or around 1999, and these payments continued to be made on a quarterly basis thereafter.

m. On or about December 22, 1999, Illinois Outside Counsel commenced litigation against the State of Illinois by filing a fee petition in Illinois State court to enforce a lien on ten percent of the State of Illinois's monetary recoveries from the Tobacco Lawsuit, in order to recover the remaining balance of the approximately $935

million that Illinois Outside Counsel claimed was due to them after subtracting the $121 million awarded in the California arbitration.

   n. On or about December 16, 2002, the State of Illinois and Illinois Outside Counsel entered into a written settlement concerning the fee petition. Among other things, this written settlement provided that the State of Illinois would pay Illinois Outside Counsel $67.5 million in three installment payments in 2003, 2004 and 2005. The payment of $67.5 million was in addition to the $121 million awarded Illinois Outside Counsel in the California arbitration. As a result, Illinois Outside Counsel was awarded a total of approximately $188.5 million in fees in connection with the Tobacco Lawsuit.

   o. SOSO, VRDOLYAK and Individual B entered into secret agreements to pay SOSO and VRDOLYAK a portion of the attorney fees awarded in the Tobacco Lawsuit and concealed these agreements from the State of Illinois, the Attorney General, Law Firm C, the tobacco companies and the attorneys for the tobacco companies. Those agreements included the following:

   (1) On or about October 8, 1996, Individual B sent SOSO a letter on Law Firm B letterhead (the "10/08/96 Agreement"), with a copy to VRDOLYAK, stating as follows: "This will confirm that with respect to any contingent fee that is awarded to us in the Illinois Tobacco litigation, if we are successful in being retained and in prosecuting the case, your share will be 2-1/2% of that contingent fee."

   (2) On or about February 16, 1999, SOSO and VRDOLYAK entered into a written agreement (the "02/16/99 Agreement") that provided that

5

VRDOLYAK would give SOSO "fifty percent (50%) of any and all fees that I am paid or receive from any source whatsoever concerning the State of Illinois Tobacco Litigation, including but not limited to, fees received from [Individual B]," and that further provided that SOSO would give VRDOLYAK "forty percent (40%) of any and all fees that I am paid or receive from any source whatsoever concerning the State of Illinois Tobacco Litigation including, but not limited to, fees received from [Individual B]."

(3) On or about May 12, 1999, Individual B sent VRDOLYAK a letter on Law Firm B letterhead (the "05/12/99 Agreement"), which stated: "As to the fees to be awarded in the Illinois tobacco litigation, we agree that you will receive ten percent of national counsel's fees." Based on a projected recovery to the State of Illinois of over $9.3 billion from the Tobacco Lawsuit, an outstanding fee request of $935 million by Illinois Outside Counsel at the time the 05/12/99 Agreement was made, and a projected recovery for National Counsel of approximately $654 million based on that outstanding fee request, Individual B agreed to make total projected payments of approximately $65 million to VRDOLYAK, who did no work on the Tobacco Lawsuit.

(4) On or about May 24, 1999, VRDOLYAK and SOSO entered into a written agreement (the "05/24/99 Agreement") that amended the 02/16/99 Agreement, and that provided SOSO "shall receive a total of three and one half (3 ½) points, representing two and one half (2 ½) points of Soso's original points pursuant to a prior agreement with outside counsel, and one (1) point from Vrdolyak in the event Vrdolyak receives the agreed upon points from outside counsel."

p. Beginning no later than in or around 1999 and continuing until in or around April 2007, Individual B caused payments to be made to VRDOLYAK or his nominee, Law Firm A, that included not only amounts payable to VRDOLYAK pursuant to the 05/12/99 Agreement, but also amounts payable to SOSO for amounts due to SOSO pursuant to the 10/08/96 Agreement and the 05/24/99 Agreement.

q. Beginning no later than in or around 2000 and continuing until at least in or around August 2005, VRDOLYAK made payments to SOSO for amounts due to SOSO under the 10/08/96 Agreement and the 05/24/99 Agreement.

### IRS Notices of Levy

r. The Internal Revenue Service was an agency of the United States Department of Treasury, responsible for administering and enforcing the tax laws of the United States. Under these laws, individuals were required to accurately report income to the IRS on income tax return forms and pay all personal income tax and tax penalties due and owing.

s. In order to collect amounts due and owing from a taxpayer who had failed to pay amounts due to the IRS, the IRS was permitted to serve a notice of levy on other individuals. An individual receiving a notice of levy was required to turn over to the IRS any income of the non-paying taxpayer in their possession or for which they were obligated. At the time a notice of levy was received, it attached to all obligations owed to the non-paying taxpayer, even if payment on an obligation was to be made to the non-paying taxpayer at a later date.

t. SOSO failed to pay income tax due and owing to the IRS, and the IRS initiated efforts to collect amounts owed by SOSO by making demands for payment to SOSO, serving notices of levy, filing federal tax liens against SOSO and obtaining information from SOSO about his sources of income.

u. VRDOLYAK was served with notices of levy on or about August 6, 2005 (the "2005 Levy"), and in or around April 2006 (the "2006 Levy," and together with the 2005 Levy, the "Notices of Levy," and each, a "Notice of Levy"), requiring VRDOLYAK to pay the IRS money due to SOSO.

2. Beginning in or around 2005 and continuing through in or around 2015, in the Northern District of Illinois, Eastern Division, and elsewhere,

DANIEL P. SOSO and
EDWARD R. VRDOLYAK,

defendants herein, together with other persons known and unknown to the Grand Jury, did corruptly obstruct and impede and did corruptly endeavor to obstruct and impede the due administration of the Internal Revenue Code, Title 26 of the United States Code, by impeding and impairing the Internal Revenue Service in carrying out its lawful function to collect taxes and secure payment of taxes.

3. It was part of the corrupt endeavor that SOSO and VRDOLYAK obstructed and impeded the collection of taxes due and owing from SOSO, by impeding and impairing the efforts of the Internal Revenue Service to collect, levy upon and seize money due to SOSO and money under SOSO's control.

4. As a further part of this corrupt endeavor, after VRDOLYAK was served with the 2005 Levy, VRDOLYAK temporarily ceased making payments to SOSO for amounts due to SOSO under the 10/08/96 Agreement and the 05/24/99 Agreement, and caused the following two false statements to be made to an IRS revenue officer:

    a. In or around August 2005, VRDOLYAK caused an acknowledgement of the 2005 Levy to be prepared and sent to an IRS revenue officer that falsely informed the revenue officer that SOSO was not owed any money, but that the 2005 Levy would be complied with in any future activity.

    b. On or about November 22, 2005, VRDOLYAK caused a facsimile to be prepared and sent to an IRS revenue officer that falsely informed the revenue officer that (i) neither VRDOLYAK nor Law Firm A had any amounts owing to SOSO; and (ii) VRDOLYAK intended to honor the 2005 Levy served on him and remit to the IRS any amounts that might be due to SOSO in the future.

5. As a further part of this corrupt endeavor, beginning in or around 2005 and continuing until at least in or around 2014, VRDOLYAK caused Individual B to make payments to VRDOLYAK and Law Firm A, which payments were due and owing to VRDOLYAK in connection with the Tobacco Lawsuit and a portion of which payments were payable to SOSO, and further caused Law Firm A to issue VRDOLYAK checks corresponding to the amounts received from Individual B and to offset amounts Law Firm A received from Individual B against VRDOLYAK's other debts to Law Firm A.

6. As a further part of this corrupt endeavor, from in or around 2005 to in or around 2014, VRDOLYAK did not remit any money to the IRS after receiving the 2005 Levy and the 2006 Levy, even though a portion of the payments made by Individual B to VRDOLYAK and his nominee, Law Firm A, were amounts due and payable to SOSO under the 10/08/96 Agreement and the 05/24/99 Agreement, and instead VRDOLYAK diverted such funds to other purposes and for his own use.

7. As a further part of this corrupt endeavor, although SOSO was aware that VRDOLYAK had received a Notice of Levy, after VRDOLYAK stopped paying SOSO, SOSO contacted Individual B in or around 2007, and asked Individual B to pay amounts due to SOSO under the 10/08/96 Agreement directly to SOSO despite the Notice of Levy.

8. As a further part of this corrupt endeavor, in or around July 2007, SOSO began receiving direct payments from Individual B for a portion of the fees owed to SOSO pursuant to the 10/08/96 Agreement.

9. As a further part of this corrupt endeavor, beginning no later than in and around July 2007 and continuing until in and around 2015, SOSO caused payments made to SOSO by Individual B and VRDOLYAK pursuant to the 10/08/96 Agreement and the 05/24/99 Agreement to be deposited in bank accounts held in the names of third parties, including bank accounts used by SOSO's relatives and girlfriend, and SOSO further caused money to be disbursed from these accounts in order to pay his own expenses and the expenses of others.

10. As a further part of this corrupt endeavor, on or about August 1, 2008, SOSO made a false statement, signed under penalty of perjury, to the IRS on a Form 433-A (Collection Information Statement for Wage Earners and Self-Employed Individuals), in which SOSO failed to declare receivables due from Law Firm B and VRDOLYAK pursuant to the 10/08/96 Agreement and the 05/24/99 Agreement, and falsely stated his monthly gross receipts from business were $2,300, when in fact SOSO (i) had already received approximately $119,363 in payments from Individual B in 2008 pursuant to the 10/08/96 Agreement, (ii) expected to continue receiving quarterly payments from Individual B pursuant to the 10/08/96 Agreement, and (iii) was owed money by VRDOLYAK pursuant to the 05/24/99 Agreement.

11. As a further part of this corrupt endeavor, on or about August 17, 2008, SOSO caused the IRS to be provided with a list of accounts receivable due to SOSO, which list of receivables was false in that it totaled approximately $10,830 and omitted all amounts due to SOSO from Law Firm B and VRDOLYAK pursuant to the 10/08/96 Agreement and the 05/24/99 Agreement.

12. As a further part of this corrupt endeavor, beginning in or around 2010 and continuing through in or around 2011, VRDOLYAK caused approximately $170,242 to be paid to SOSO and a recipient designated by SOSO for amounts due to SOSO in connection with the Tobacco Lawsuit, including checks that VRDOLYAK caused a relative to issue made payable to SOSO.

13. As a further part of this corrupt endeavor, between in and around 2012 and in and around 2014, SOSO and VRDOLYAK negotiated the terms under which VRDOLYAK would pay outstanding funds due to SOSO under the 10/08/96 Agreement and the 05/24/99 Agreement, which funds VRDOLYAK had not tendered to the IRS as required by the Notices of Levy.

In violation of Title 26, United States Code, Section 7212(a), and Title 18, United States Code, Section 2.

## COUNT TWO

The SPECIAL AUGUST 2015 GRAND JURY further charges:

1. Paragraph 1 of Count One of this superseding indictment is incorporated here.

2. SOSO's tax due for income SOSO received between calendar years 2000 and 2013 included tax due on income SOSO received pursuant to the 10/08/96 Agreement and the 05/24/99 Agreement.

3. SOSO did not timely file a personal income tax return for the calendar years 2008, 2009, 2010, 2011 and 2012, and instead filed these returns in 2014, shortly after learning about a federal law enforcement inquiry concerning SOSO.

4. Beginning no later than approximately 2003 and continuing through in or around 2015, in the Northern District of Illinois, Eastern Division, and elsewhere,

DANIEL P. SOSO and
EDWARD R. VRDOLYAK,

defendants herein, together with other persons known and unknown to the Grand Jury, did willfully attempt to evade and defeat the payment of income tax due and owing by SOSO to the United States for the calendar years 1993, 1994, 1995, 1996, 1997, 1998, 1999, 2000, 2001, 2002, 2003, 2004, 2008, 2009, 2010, 2011, 2012, and 2013, by committing the following affirmative acts, among others:

    a. Beginning no later than in or around 2003 and continuing through in or around 2015, SOSO caused payments made to SOSO, including payments made pursuant to the 10/08/96 Agreement and the 05/24/99 Agreement, to be deposited in bank

accounts held in the name of third parties, including bank accounts used by SOSO's relatives and girlfriend, and SOSO further caused money to be disbursed from these accounts in order to pay his own expenses and the expenses of others.

  b. Beginning no later than in or around 2005 and continuing through in or around 2014, after receiving a Notice of Levy, VRDOLYAK caused funds payable to SOSO to be paid to himself and Law Firm A instead of remitting them to the IRS.

  c. In or around August 2005, VRDOLYAK caused an acknowledgement of the 2005 Levy to be prepared and sent to an IRS revenue officer that falsely informed the revenue officer that SOSO was not owed any money, but that the 2005 Levy would be complied with in any future activity.

  d. On or about November 22, 2005, VRDOLYAK caused a facsimile to be prepared and sent to an IRS revenue officer that falsely informed the revenue officer that neither VRDOLYAK nor Law Firm A had any amounts owing to SOSO and that VRDOLYAK intended to honor the 2005 Levy and remit to the IRS any amounts that might be due to SOSO in the future.

  e. Beginning no later than in or around July 2007 and continuing through in or around 2015, SOSO caused Law Firm B to send payments owed to SOSO pursuant to the 10/08/96 Agreement to SOSO or SOSO's nominee rather than to VRDOLYAK, who had been served by the IRS with the Notices of Levy.

  f. Beginning no later than in or around 2007 and continuing through in or around 2014, SOSO (i) caused individuals to provide him with credit cards that were

14

issued under accounts opened in their names; (ii) used these credit cards to pay for his personal expenses; and (iii) reimbursed these individuals for his use of their credit card accounts.

g. On or about August 1, 2008, SOSO made a false statement, signed under penalty of perjury, to the IRS on a Form 433-A (Collection Information Statement for Wage Earners and Self-Employed Individuals), in which SOSO failed to declare receivables due to SOSO pursuant to the 10/08/96 Agreement and the 05/24/99 Agreement, and falsely stated that his monthly gross receipts from business were $2,300, when in fact SOSO (i) had already received approximately $119,363 in payments in 2008 pursuant to the 10/08/96 Agreement, (ii) expected to continue receiving quarterly payments pursuant to the 10/08/96 Agreement, and (iii) was owed money by VRDOLYAK pursuant to the 05/24/99 Agreement.

h. On or about August 17, 2008, SOSO caused the IRS to be provided with a list of accounts receivable due to SOSO, which list of receivables was false in that it totaled approximately $10,830 and omitted all amounts due to SOSO pursuant to the 10/08/96 Agreement and the 05/24/99 Agreement.

i. From in or around 2010 and continuing through in or around 2011, after receiving a Notice of Levy, VRDOLYAK caused funds due to SOSO to be paid to SOSO and a recipient designated by SOSO instead of remitting them to the IRS, as required by the Notices of Levy.

j. From in and around 2012 through in and around 2014, SOSO and VRDOLYAK negotiated the terms under which VRDOLYAK would pay outstanding funds due to SOSO under the 10/08/96 Agreement and the 05/24/99 Agreement.

In violation of Title 26, United States Code, Section 7201, and Title 18, United States Code, Section 2.

## COUNT THREE

The SPECIAL AUGUST 2015 GRAND JURY further charges:

On or about October 17, 2011, in the Northern District of Illinois,

DANIEL P. SOSO,

defendant herein, a resident of the Northern District of Illinois, having received gross income in excess of the amount required to file an income tax return, and thereby being required by law to file an income tax return (Form 1040 with schedules and attachments) following the close of the calendar year 2010 and on or before October 17, 2011, willfully failed to make and file such return at the time required by law;

In violation of Title 26, United States Code, Section 7203.

## COUNT FOUR

The SPECIAL AUGUST 2015 GRAND JURY further charges:

On or about October 15, 2012, in the Northern District of Illinois,

### DANIEL P. SOSO,

defendant herein, a resident of the Northern District of Illinois, having received gross income in excess of the amount required to file an income tax return, and thereby being required by law to file an income tax return (Form 1040 with schedules and attachments) following the close of the calendar year 2011 and on or before October 15, 2012, willfully failed to make and file such return at the time required by law;

In violation of Title 26, United States Code, Section 7203.

## COUNT FIVE

The SPECIAL AUGUST 2015 GRAND JURY further charges:

On or about October 15, 2013, in the Northern District of Illinois,

DANIEL P. SOSO,

defendant herein, a resident of the Northern District of Illinois, having received gross income in excess of the amount required to file an income tax return, and thereby being required by law to file an income tax return (Form 1040 with schedules and attachments) following the close of the calendar year 2012 and on or before October 15, 2013, willfully failed to make and file such return at the time required by law;

In violation of Title 26, United States Code, Section 7203.

A TRUE BILL

_____
FOREPERSON

_____
UNITED STATES ATTORNEY